# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

05 11618 WGY

JUDY LEVIN,

        Plaintiff,

v.

E.I. DUPONT DE NEMOURS & COMPANY,

        Defendant.

MAGISTRATE JUDGE _Alexander_

C.A. No:

Jury Trial Demanded

RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE

## COMPLAINT

Plaintiff, Judy Levin, on her own behalf and on behalf of all other Class members, by and through her undersigned counsel, alleges as follows for her complaint:

## I.   INTRODUCTION

1.   This is a class action seeking monetary and other relief from E.I. DuPont De Nemours & Company ("DuPont") on account of the potential for serious health hazards resulting from DuPont's manufacture, sale and advertising for over fifty (50) years of a product commonly known as "Teflon." Cooking products containing Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans.

2.   DuPont manufactured, distributed and advertised Teflon when it knew or should have known that Teflon contains substances that are dangerous and harmful to the public that can be released when cooking products made with Teflon are used for their intended purposes.

3.      This action is brought to require DuPont (i) to pay damages to the Plaintiff and other Class Members who purchased cooking products containing DuPont's Teflon product; (ii) to create a fund for ongoing medical monitoring of persons who have purchased cooking products containing Teflon; (iii) to create a fund for independent scientific researchers to investigate further the potential for adverse health effects to persons who have used cooking products containing Teflon; and (iv) to require that DuPont provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon.

## II.    JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorneys' fees and is between citizens of different States.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts

## III.   REPRESENTATIVE CLASS PLAINTIFFS

6.      Plaintiff, Judy Levin, is a resident of Newton, Middlesex County, Massachusetts who has purchased and used cooking products containing or made with DuPont's Teflon product.

7.      Defendant DuPont is a Delaware corporation.  DuPont sells, distributes and/or licenses Teflon for use in products sold throughout the Commonwealth of Massachusetts and elsewhere.

2

8.    DuPont is in the business of manufacturing and supplying Teflon for distribution, marketing, wholesaling and retailing in various products made for consumer use. Included among these products are housewares, household appliances, and cooking products such as pots and pans.

9.    Defendant DuPont is subject to the jurisdiction of this Court pursuant to Massachusetts General Laws, chapter 223A § 3 by:

(a)    transacting business in the Commonwealth;

(b)    contracting to supply services or things in the Commonwealth; and

* * * *

(d)    causing tortious injury in the Commonwealth by an act or omission outside the Commonwealth while regularly conducting business, engaging in a persistent course of conduct, or deriving substantial revenue from goods used in the Commonwealth.

## IV.    BACKGROUND AND GENERAL ALLEGATIONS

10.    DuPont was founded in 1802.

11.    DuPont operates in more than seventy (70) countries.

12.    Teflon was invented in 1938 at DuPont's Jackson Laboratory.

13.    Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

14.    DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

15.    As DuPont proudly boasts in its Teflon website:

Teflon is really everywhere. Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

3

16.    Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

17.    Teflon and the chemicals used in its production represent a $2 billion per year industry.

18.    DuPont nets an estimated $200 million per year from its sale of Teflon.

19.    DuPont has advertised and represented to the public that Teflon makes life easy, and reportedly has called Teflon a "housewife's best friend."

20.    DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon enhances consumer recognition.

21.    During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers. DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon can be harmful to human health.

22.    Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon. PFOA is also sometimes referred to by DuPont as C-8.

23.    PFOA is the chemical used to give Teflon its "non-stickiness."

24.    PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

4

25. PFOA is associated with other health concerns in animals, including cancer and developmental defects.

26. PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

27. For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested. The children were located in 23 states.

28. Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

29. DuPont has conducted both animal and human studies and tests on PFOA.

30. DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cooking products coated with Teflon and has denied that the use of cooking products coated with Teflon can be harmful to human health.

31. In 1981, however, 3M, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals.

32. Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees employed at the plant where PFOA is manufactured. This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

33. A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

5

34.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby. Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

35.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats. The EPA considered this information to be "substantial risk data." DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans and further failed to disclose to the EPA the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

36.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

37.     More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

38.     The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

6

39.    Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA.

40.    Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

41.    Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

42.    DuPont's concealment of its 1981 blood sample study information may well have altered the continued commercialization of Teflon and the profits received by DuPont from its sale of Teflon. As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

43.    DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act.

44.    In May, 2005, however, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

7

45.    There are numerous additional facts and studies that demonstrate that exposure to PFOA causes adverse health effects. PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals. For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

46.    Various studies have confirmed that exposure to PFOA causes or may cause vascular disease. For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA. Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA. Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA. Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

47.    Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer. For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality. Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA. Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

8

48.   There are numerous other studies demonstrating many potential health risks

related to exposure to PFOA. Some of these studies include:

a.   Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989. Additionally, a general mortality study found an increase in leukemia.

b.   Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally. An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

c.   At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

d.   At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

e.   A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

f.   There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

49.   Over 40 years ago, DuPont conducted human experiments with Teflon-laced

cigarettes to determine why certain workers were becoming sick on the job with a Teflon-

related illness commonly called Polymer Fume Fever. DuPont laced the cigarettes of its

volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became

sick. In these dosing experiments up to 90% of the people in the highest dose group

became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills,

back ache, fever and coughing. These symptoms are commonly linked to Polymer Fume

Fever. DuPont acknowledges that Teflon fumes can sicken people, causing Polymer

Fume Fever.

50.    Moreover, apparently aware of the adverse effects in humans of inhaling heated Teflon, DuPont required its employees to wear respirators when working with Teflon heated to 400°F (or more) while in poorly ventilated areas.   Experiments demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this temperature within 2 minutes using a conventional stove top burner set on high.

51.    Reports indicate that a Teflon coated pan reached 721°F in just five minutes under the same test. DuPont studies show that Teflon emits toxic particulates at 446°F. At 680°F Teflon coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.   At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000°F), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

52.    For the past fifty years DuPont has claimed that their Teflon coatings do not emit hazardous chemicals through normal use. In a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C). These temperatures alone are well above the normal cooking range." Reported tests show, however, that Teflon coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high. The toxic particles and gases emitted when Teflon heats and the temperatures at which these particles and gases are first emitted, follow:

> 464°F – Ultrafine particulate matter:  Teflon produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680ºF – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.    In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA): Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic. Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision. If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA): The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4): Silicon tetrafluoride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung. Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia*)*, discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is

many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932°F – Carbonyl fluoride (COF2): Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure. Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932°F – Hydrogen fluoride (HF): Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112°F – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°F – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

53.     The EPA has recently identified significant human health concerns from

exposure to PFOA.

54.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB")

released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk

Assessment of the Potential Human Health Effects Associated with Exposure to

Perfluorooctanoic Acid (PFOA)."

55.     A majority of members of the EPA's SAB concluded that PFOA was likely to

cause cancer in humans. The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously

12

determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**. According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

(Emphasis added.)

56.     DuPont nonetheless continues to claim that the use of Teflon in cooking products is completely safe.

## VI.    CLASS ACTION ALLEGATIONS

57.     This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

58.     Plaintiff brings this action both in her individual capacity, and as a representative of a class consisting of all persons who have purchased in the Commonwealth of Massachusetts cooking products that were made with or contain Teflon and were damaged thereby.

59.     The size of the Class is currently unknown but is estimated to be millions of people.

60.     The members of the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

61.     Common questions of law and fact exist as to all members of the Class. Questions of law and fact common to the Class, among others, are:

a.     Whether the class members purchased a cooking product made with or containing Teflon.

b.     Whether DuPont represented to the public that Teflon or the use of Teflon coated cooking products was safe.

c.     Whether DuPont has denied that Teflon or the use of Teflon coated cooking products can be potentially harmful to human health.

d.     Whether DuPont had in its possession animal or human test data indicating potential adverse health effects from one or more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

e.     Whether DuPont had in its possession blood sample test results of its workers indicating transplacental movement of one of more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

f.     Whether DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees that DuPont failed to disclose to the consuming public.

g.     Whether DuPont had in its possession information demonstrating or tending to demonstrate that PFOA may present a risk of injury to human health that DuPont failed to disclose to the consuming public.

h.     Whether the EPA advised DuPont that evidence of transplacental movement of PFOA in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public.

i.     Whether DuPont knew or should have known that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health.

14

        j.     Whether DuPont had in its possession information demonstrating or tending to demonstrate that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health that DuPont failed to disclose to the consuming public.

        k.     Whether DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

        l.     Whether DuPont had in its possession information demonstrating or tending to demonstrate that fumes from Teflon coated cooking products can sicken people that DuPont failed to disclose to the consuming public.

        m.    To what extent class members have suffered damages and the proper measure of damages.

    62.    These common questions of law and fact predominate over any questions that affect only individual Class Members.

    63.    Plaintiff's claims are typical of those of other members of the Class.

    64.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class actions.

    65.    A class action is the best available method for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible. Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Should each individual member of the Class be required to bring a separate action, the resulting multiplicity of

lawsuits would cause undue hardship and expense on the Court and on the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests. There will be no difficulty in the management of this suit as a class action.

## COUNT I

## BREACH OF WARRANTY

66.    Plaintiff repeats and realleges each and every allegation set forth above.

67.    Defendant designed, manufactured, marketed, distributed, sold and licensed Teflon for use in cooking products knowing that Teflon would be contained in such products sold to the public in Massachusetts and elsewhere.

68.    Defendant reasonably expected that plaintiff and members of the Class would purchase cooking products made with defendant's Teflon.

69.    The Teflon in products purchased by plaintiff and members of the Class was and is hazardous and inherently dangerous for its intended use because it contains substances that are likely to be carcinogenic. Teflon, when heated in ordinary use, emits toxic substances.

70.    Defendant expressly and impliedly warranted to plaintiff and the members of the Class that its Teflon in cooking products was safe, merchantable and fit for its intended uses. Defendant breached its warranties to plaintiff and the members of the Class because the Teflon was unsafe, hazardous to health, not of merchantable quality, and unfit for its intended purposes and uses.

16

71.     Defendant designed, manufactured, marketed, distributed, sold and licensed Teflon for use in cooking products, which products by reason of their use of Teflon were in a defective condition and dangerous and defective in design and materials, rendering such products unreasonably dangerous to the user.

72.     As a direct and proximate result of the foregoing, plaintiff and the members of the Class have been damaged.

## COUNT II

### NEGLIGENCE

73.     Plaintiff repeats and realleges each and every allegation set forth above.

74.     Defendant was negligent in the design, manufacture, marketing, distribution, sale and licensing of Teflon for use in cooking products.

75.     Defendant negligently failed to warn, instruct, adequately warn or adequately instruct the plaintiff and members of the Class concerning the dangers and defective nature and condition of cooking products with Teflon.

76.     Defendant had a duty to use reasonable care in the manner in which it designed, manufactured, distributed, marketed, sold and licensed Teflon for use in cooking products.

77.     As a direct and proximate result of the foregoing, plaintiff and the members of the Class have been damaged.

## COUNT III

## UNJUST ENRICHMENT

78.    Plaintiff repeats and realleges each and every allegation set forth above.

79.    Plaintiff and the members of the Class purchased cooking products with Teflon, without understanding the true nature of defendant's Teflon and the health hazards associated with the use of cooking products with Teflon.

80.    As a consequence of defendant's conduct, plaintiff and the members of the Class purchased cooking products with Teflon that they would not have otherwise purchased, or paid a price higher than they would have otherwise.

81.    The monies paid by plaintiff and the members of the Class in the purchase of cooking products with Teflon, which resulted in substantial revenue to DuPont, conferred substantial benefits upon defendant.  Defendant knew of and appreciated the benefits conferred upon it by the members of the Class and accepted and retained these benefits.

82.    By virtue of the foregoing, defendant has been unjustly enriched in an amount yet to be determined, to the extent defendant received and kept revenues relating to the sale of cooking products with Teflon, that defendant would not have received absent its improper conduct.

83.    Under these circumstances, it would be inequitable and unjust for defendant to retain the benefits conferred by plaintiff and the members of the Class.  Defendant failed to disgorge its ill-gotten gains to plaintiff and the members of the Class.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the members of the Class, prays for judgment as follows:

18

1.    Declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Finding defendant liable as alleged in this complaint;

3.    Awarding plaintiff and the members of the Class damages, together with interest thereon;

4.    Disgorgement and restitution;

5.    Awarding plaintiff and the members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees; and

6.    Awarding plaintiff and the members of the Class such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury of all issues so triable as a matter of law.

Dated: August 4, 2005                    By her attorneys,


Thomas G. Shapiro (BBO #454680)
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
Tel:    (617) 439-3939


Of Counsel:
Kluger, Peretz, Kaplan & Berlin, P.L.
201 So. Biscayne Blvd., Suite 1700
Miami, FL 33131
Tel:    (305) 379-9000

JS 44 (Rev. 3/99)
# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

JUDY LEVIN

## DEFENDANTS

E.I. DUPONT DE NEMOURS & COMPANY

(b) County of Residence of First Listed Plaintiff   Middlesex County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Out of State
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Thomas G. Shapiro
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
(617) 439-3939

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

X 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | X 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | X 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 22 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 362 Personal Injury— | ☐ 625 Drug Related Seizure | ☐ 23 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | Med. Malpractice | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 365 Personal Injury — | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal | ☐ 650 Airline Regs. | | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Injury Product | ☐ 660 Occupational | ☐ 820 Copyrights | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | Liability | Safety/Health | ☐ 830 Patent | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 840 Trademark | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | X 370 Other Fraud | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | | | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of |
| | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | Determination Under Equal |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | | Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 U.S.C.A. & 1332(a)(1) and (d)(2)

## VII. REQUESTED IN COMPLAINT:
X  CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE   8/4/01

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUN _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)____ JUDY LEVIN v. E.I. DUPONT DE NEMOURS & COMPANY

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
    COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

___     I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

___     II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

_X_     III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

___     IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

___     V.      150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
    HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
    COURT?
                                                            YES ☐      NO  X

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
    PUBLIC INTEREST?  (SEE 28 USC §2403)
                                                            YES ☐      NO  X
    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                            YES ☐      NO  X

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
    28 USC §2284?
                                                            YES ☐      NO  X

7.  DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
    COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
    SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                            YES  X     NO  ☐

        A.      IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

                EASTERN DIVISION   X      CENTRAL DIVISION  ☐      WESTERN DIVISION  ☐

        B.      IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
                GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

                EASTERN DIVISION  ☐      CENTRAL DIVISION  ☐      WESTERN DIVISION  ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME __ Thomas G. Shapiro

ADDRESS __ Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109

TELEPHONE NO. __ (617) 439-3939

(Levin Filing Category Form.wpd - 11/27/00)