**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RONNA CASPER,<br>JORGE MONTOY,<br><br>               Plaintiffs,<br><br>v.<br><br>E.I. DUPONT DE NEMOURS & COMPANY,<br><br>               Defendant. | C.A. No: 05-11618  WGY<br><br>Jury Trial Demanded |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Ronna Casper and Jorge Montoy, on their own behalf and on behalf of all other Class members, by and through their undersigned counsel, allege as follows for their Complaint:

## I.  <u>INTRODUCTION</u>

1.     This is a class action seeking monetary and other relief arising from E.I. DuPont De Nemours & Company ("DuPont")'s unfair and deceptive trade practices in making fraudulent, false, misleading, and deceptive representations, and corresponding material omissions, about the purported safety of a cookware coating product manufactured and sold by DuPont under the common name "Teflon®."  DuPont knew or should have known, but failed to disclose to the consuming public, that cookware coated in DuPont's Teflon® product, when used as intended under normal everyday circumstances, can release harmful and dangerous substances, chemicals, and particulates, including toxins and likely human carcinogens, exposing consumers to potentially serious health risks.

2.      DuPont designed, manufactured, distributed, sold, advertised and marketed Teflon®, using these unfair and deceptive misrepresentations and omissions, when it knew or should have known - based on, *inter alia*, studies that DuPont conducted on its own workers - that Teflon® contains numerous substances, including a chemical compound called PFOA, which are dangerous and harmful to the public, which can be released when cookware coated with Teflon® is used as intended, which have bioaccumulative and biopersistent properties, and which can pass from mothers to their children *in utero*.

3.      Consumers, including Plaintiffs and the members of the Class, purchased cookware coated with DuPont's Teflon® product, without knowing of the risks and dangers that Teflon® posed to them and their families.  DuPont's misrepresentations and omissions, as detailed herein, ensured that consumers either entered into transactions to purchase Teflon® coated cookware that they would not otherwise have purchased had the truth about Teflon® been disclosed or else paid too high a price for the Teflon® coated cookware that they did purchase.

4.      This action is brought to require DuPont, *inter alia*, (i) to pay damages and/or restitution to the Plaintiffs and other Class members who purchased cookware coated with DuPont's Teflon® product; (ii) to disgorge its ill-gotten profits from the sale of Teflon® as a cookware coating product; (iii) to create a fund for ongoing medical monitoring of persons who have purchased cookware coated with Teflon®; (iv) to create a fund for independent scientific researchers to investigate further the potential for adverse health effects to persons who have used cookware coated with Teflon®; and (v) to enter an injunction barring DuPont from continuing to license, design, manufacture, market, advertise, sell and/or distribute its Teflon® product as a cookware coating or, alternatively, an injunction

requiring DuPont and its licensees to provide an adequate warning label, disclosing the risks and hazards of Teflon®, on all Teflon® coated cookware sold in the future.

## II.    PARTIES

5.    Plaintiff, Ronna Casper, is a Massachusetts resident who has purchased and used within Massachusetts cookware coated with DuPont's Teflon® product.

6.    Plaintiff, Jorge Montoy, is a Massachusetts resident who has purchased and used within Massachusetts cookware coated with DuPont's Teflon® product.

7.    Defendant DuPont is a Delaware corporation.    DuPont designs, manufactures, advertises, markets, sells, distributes and/or licenses Teflon® for use in numerous consumer goods, including cookware, sold throughout the Commonwealth of Massachusetts and elsewhere.

## III.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorneys' fees and is between citizens of different States.

9.    Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts

10.    Defendant DuPont is subject to the jurisdiction of this Court pursuant to Massachusetts General Laws, chapter 223A § 3 by:

(a)    transacting business in the Commonwealth;

(b)    contracting to supply services or things in the Commonwealth; and

* * * *

3

(d)     causing tortious injury in the Commonwealth by an act or omission outside the Commonwealth while regularly conducting business, engaging in a persistent course of conduct, or deriving substantial revenue from goods used in the Commonwealth.

## IV.     BACKGROUND AND GENERAL ALLEGATIONS

### A.     Teflon®'s History and Commercial Success, DuPont's Repeated Claims Regarding Its Safety and Fitness for Use as A Cookware Coating, and DuPont's Licensing of Teflon® for this Use.

11.     DuPont was founded in 1802.

12.     DuPont operates in more than seventy (70) countries.

13.     Teflon® was invented in 1938 at DuPont's Jackson Laboratory.

14.     Teflon® is DuPont's trademarked name for the chemical product called polytetrafluoroethylene (PTFE).

15.     DuPont has registered the Teflon® trademark in 19 countries and first began selling Teflon® commercially in 1946.

16.     As DuPont proudly boasts in its Teflon® website, www.teflon.com:

> Teflon® is really everywhere. Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.[1]

17.     DuPont's Teflon® product is commonly used as a cooking surface coating in "non-stick" cookware, such as in pots and  pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

18.     DuPont's Teflon® product and the chemicals used in its production together represent a $2 billion per year industry.

---

[1]  See http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?pageId=/consumer/na/eng/brandWorld/regional_product_list.html.

4

19.     DuPont nets an estimated $200 million per year from its sale of Teflon®.

20.     DuPont has advertised and represented to the public that Teflon® makes life easy, and reportedly has called Teflon® a "housewife's best friend."

21.     DuPont claims on its Teflon® website, www.teflon.com, that "the Teflon® brand is one of the world's most recognized and respected" brands and has strong consumer recognition.

22.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon® are safe for use by consumers.  DuPont has represented to consumers in public statements and documents, in press releases and on its websites that Teflon® is safe for consumer use and has denied that the use of cookware coated with its Teflon® product can be harmful to human health.

23.     DuPont's Teflon® website, www.teflon.com, is replete with statements touting the safety of Teflon® coated cookware, such as "Cookware made with Teflon® non-stick coating is totally safe for everyday use."[2]

24.     DuPont has backed such claims with boasts, such as the following, of its decades of quality assurance and testing work concerning cookware that is coated with its Teflon® product:

> DuPont certification seal means you can trust cookware to meet the toughest DuPont standards for quality and performance.  Standards are upheld by a unique 13-point checklist for quality assurance.  Plus, DuPont tests cookware in a rigorous battery of real-world tests, including over 30 years of in-home kitchen testing and an ongoing program of

_____

[2] See, e.g., http://www.teflon.com/Teflon/downloads/pdf/facts_about_teflon.pdf.

professional chef testing conducted in commercial restaurants.[3]

25.    In addition, DuPont has represented to consumers that it retains oversight and control of the use of its Teflon® product by licensees who wish to combine it with their cookware products. For example,

> Before a manufacturer is licensed to use a DuPont non-stick coating, they must submit their products to DuPont to make certain that exacting quality standards are met.  Once a manufacturer is licensed, DuPont conducts periodic testing to ensure that those standards are consistently upheld.  Finally, each manufacturer conducts in-house tests against their own quality standards.[4]

26.    Dupont has knowledge of all licensees authorized to manufacture or sell cookware coated with or otherwise incorporating its Teflon® product and knowledge of the brand and model names so marketed.   Upon information and belief, and subject to information obtainable only through pre-trial discovery, DuPont has licensed the use of Teflon® for use by, *inter alia*, the following manufacturers and/or models of cookware:

| Manufacturer | Models |
|---|---|
| All Clad | Emerilware LTD Cop-R-Chef Copper-Core MC2 |

---

[3]  See, e.g., http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?...ookware/cookware/ nonStick/howDoesIt/cons_how_work.html.

[4]  Id.

| Manufacturer | Models |
|---|---|
| Analon | Analon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Cresware | DuPont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Platinum Pro<br>Platinum Select<br>Xtra<br>Classic |
| Farberware | Farberware, Inc.<br>Farberware Millennium<br>Farberware Nonstick Aluminum<br>Restaurant Pro<br>Enhanced Nonstick Cookware Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
| GAU | |
| GSI | Bugaboo |

| Manufacturer | Models |
|---|---|
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar | |
| Salton | |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

**B.     Teflon®'s Chemical Components, Their Toxic and Dangerous Properties, and DuPont's Knowledge and Nondisclosure Thereof.**

**1.     Perflourooctanoic acid (PFOA)**

27.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed and/or distributed by DuPont in connection with its manufacture of Teflon®.  PFOA is also sometimes referred to by DuPont as "C-8."

28.     PFOA is the chemical used to give DuPont's Teflon® product its legendary "non-stickiness."

29.     DuPont has conducted both animal and human studies and tests on PFOA. In addition, DuPont had knowledge of studies and tests conducted by others, including 3M, another manufacturer of PFOA.

30.     PFOA is man-made and does not occur anywhere in nature.

31.     PFOA is nonetheless now found to contaminate the blood of humans in all geographic regions of the United States.  For example, a 2001 study by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

32.     PFOA is a liver toxin in animals, is biopersistent in humans and animals, and is bioaccumulative in humans.

33.     PFOA is associated with health concerns in animals, including cancer and developmental defects.

34.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

35.     In 1981, 3M advised DuPont that PFOA may cause birth defects in laboratory animals.

36.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees at the plant where PFOA is manufactured.  This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

37.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, to monitor umbilical cord blood for the presence of PFOA, and to test the babies' blood for the presence of PFOA.

38.    The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby.  Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

39.    In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA, however, both its possession of human blood sampling data from 1981 that confirmed the transplacental movement of PFOA in humans and the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

40.    The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

41.    More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

42.    The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

43.     Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA of which DuPont was aware.

44.     Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies.  One child had eye and tear duct defects and the second had nostril and eye defects.

45.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

46.     DuPont's concealment of its 1981 blood sample study information protected the continued commercialization and marketability of DuPont's Teflon® product and the profits received by DuPont from Teflon® sales.  As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

47.     DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act and the Resource Conservation and Recovery Act by withholding information from the agency about the potential health and environmental risks of PFOA.  As a condition of settlement, DuPont agreed to pay a combined $16.50

**million**, including $10.25 million in fines and $6.25 million for environmental projects (including a research program to evaluate the potential for biodegradation of chemicals such as PFOA).

48.    EPA officials have stated that this settlement represents the largest civil administrative penalty the agency has **ever** obtained under any federal environmental statute.    Discussing the DuPont settlement, Granta Nakayama, EPA's Assistant Administrator for Enforcement and Compliance, stated, "This sends a strong message that companies are responsible for promptly giving EPA risk information associated with their chemicals."

49.    Despite this settlement, the federal government's interest in and concerns over PFOA continue.  The EPA is even now continuing its risk assessment process for PFOA.  In a draft report released in the summer of 2005, the majority of members on a scientific advisory board that reviewed the EPA's draft risk assessment concluded that PFOA is "likely" to be a human carcinogen, a finding that went *beyond* the EPA's determination that there was "suggestive evidence" from animal studies that PFOA and its salts are potentially carcinogenic in humans.

50.    Further, in May, 2005, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

51.    There are numerous additional facts and studies that demonstrate that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

52.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease in humans.  For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA.  Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA. Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

53.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer in humans.  For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Workers at 3M's Decatur, Alabama plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

54.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA.  Some of these studies include:

a.     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989.  Additionally, a general mortality study found an increase in leukemia.

b.    Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.  An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

c.    At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

d.    At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

e.    A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

f.    There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

55.    The EPA has recently identified significant human health concerns from exposure to PFOA.

56.    On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

57.    A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans.  The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**.  According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as  EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

(Emphasis added.)

58.    A recent study by the Centers for Disease Control showed that PFOA has contaminated the bloodstream of fetuses throughout the Unites States.

### 2.    Other Chemicals Contained in Teflon® and Released through Use of Teflon® Coated Cookware

59.    Over 40 years ago, DuPont conducted human experiments with Teflon®-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon®-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon® and had the volunteers inhale the cigarette fumes until they became sick.  In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing.  These symptoms are commonly linked to Polymer Fume Fever.  DuPont now acknowledges that Teflon® fumes can sicken people, causing Polymer Fume Fever.

60.    Moreover, apparently aware of the adverse effects in humans of inhaling heated particulates or fumes emitted by Teflon®, DuPont required its employees to wear respirators when working with Teflon® heated to 400°F (or more) while in poorly ventilated areas.  Experiments demonstrate that when cooking in the home, the surface of a Teflon®

coated pan can reach this temperature within *2 minutes* using a conventional stove top burner set on high.

61.     Reports indicate that a Teflon® coated pan reached 721ºF in just five minutes.  DuPont studies show that Teflon® emits toxic particulates at 446ºF.  At 680ºF Teflon® coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000ºF), Teflon® non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

62.     For the past fifty years DuPont has claimed that its Teflon® product, when used as a cookware coating, does not emit hazardous chemicals through normal use.  In a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660ºF (340ºC).  These temperatures alone are well above the normal cooking range."  Reported tests show, however, that Teflon® coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.

63.     The toxic particles and gases emitted when Teflon® heats and the temperatures at which these particles and gases are first emitted, follow:

> 464ºF – Ultrafine particulate matter:  Teflon® produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure.  Longer exposure causes death.
>
> 680ºF – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning. In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA): Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic. Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision. If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA): The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4): Silicon tetrafluoride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung. Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932ºF – Carbonyl fluoride (COF2): Breakdown of Teflon® in the air is the major source of carbonyl fluoride exposure.

Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932ºF – Hydrogen fluoride (HF): Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112ºF – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112ºF – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

**C.      DuPont's Failure to Disclose the Risks and Dangers Posed by Teflon®, and the Chemicals it Contains, When Teflon® is Used as a Cookware Coating.**

64.      DuPont at all times relevant did not disclose to consumers any of the preceding studies, tests, or data discussed herein.

65.      DuPont at all times relevant did not issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

66.      DuPont at all times relevant did not instruct or require that its Teflon® licensees, who manufacture the cookware onto which DuPont's Teflon® product is applied, issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

67.     Instead, DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cookware coated with its Teflon® product and has denied that the use of Teflon® coated cookware can be harmful to human health.

68.     DuPont likewise has continuously claimed that the use of its Teflon® product as a cookware coating is completely safe.

## VI.    CLASS ACTION ALLEGATIONS

69.     This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and pursuant to G.L. c. 93A §9(2).

70.     Plaintiffs bring this action both in their individual capacity, and as representatives of a Class consisting of all persons who have purchased in the Commonwealth of Massachusetts cookware that was coated with or otherwise contains Dupont's Teflon® product and who were damaged thereby.

71.     The size of the Class is currently unknown but is estimated to be at least hundreds of thousands of people.

72.     The members of the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

73.     Common questions of law and fact exist as to all members of the Class. Questions of law and fact common to the Class, among others, are:

a.     Whether the Class members purchased an item of cookware containing DuPont's Teflon® product;

b.      Whether DuPont represented to the public that its Teflon® product, or the use of cookware coated with Teflon®, was safe;

c.      Whether DuPont has denied that its Teflon® product, or the use of cookware coated with Teflon®, can be potentially harmful to human health;

d.      Whether DuPont had in its possession, or knew of, animal or human test data indicating potential adverse health effects, from one or more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

e.      Whether DuPont had in its possession, or knew of, blood sample test results of DuPont workers indicating transplacental movement of one or more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

f.      Whether DuPont had in its possession, or knew of, data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals or compounds in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

g.      Whether DuPont had in its possession, or knew of, information or data demonstrating or tending to demonstrate that PFOA present in its Teflon® product may present a variety of risks of injury to human health - including, *inter alia*, cancer, tumors, organ damage, changes in blood chemistry, and vascular disease - which DuPont failed

to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

h.    Whether the EPA advised DuPont that evidence of transplacental movement of PFOA, a component of Teflon®, in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public or that DuPont failed to issue adequate warnings to the consuming public about;

i.    Whether DuPont knew or should have known that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, which are harmful or potentially harmful to human health;

j.    Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, that are harmful or potentially harmful to human health;

k.    Whether DuPont knew or should have known that fumes from heated cookware coated with its Teflon® product can sicken people;

l.    Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that fumes from heated cookware coated with its Teflon® product can sicken people; and

m.    To what extent Class members have suffered damages and the proper measure of damages.

74.    These common questions of law and fact predominate over any questions that affect only individual Class Members.

75.    Plaintiffs' claims are typical of those of other members of the Class.

76.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions.

77.    A class action is the best available method for the fair and efficient adjudication of this controversy.  The members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible.  Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein.  Should each individual member of the Class be required to bring a separate action, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants.  The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.  There will be no difficulty in the management of this suit as a class action.

## VII.    RELEVANT STATUTES AND ATTORNEY GENERAL REGULATIONS

78.    The implied warranty of merchantability in Massachusetts is set forth, in relevant part, as follows:

(1) ... [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. ...(2) Goods to be merchantable must at least be such as (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any.

G.L. c. 106 §2-314.

79.    The implied warranty of fitness in Massachusetts is set forth, in relevant part,

as follows:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is...an implied warranty that the goods shall be fit for such purpose.

G.L. c. 106 §2-315.

80.    In Massachusetts,

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods.  The manufacturer, seller, lessor or supplier may not exclude or limit the operation of this section.

G.L. c. 106 §2-318.

81.    Under Massachusetts law,

Whoever, by deceit or fraud, sells personal property shall be liable in tort to a purchaser in treble the amount of damages sustained by him.

G.L. c. 231 §85J.

82.    Numerous provisions of the regulations of the Massachusetts Attorney General are relevant to this action.  They include the following.

3.02:  False Advertising ... (2) No statement or illustration shall be used in any advertisement which creates a false impression of the...quality,...value,...usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another.  Even though the true facts are subsequently made known to the buyer, the law is violated if the first contact...is secured by deception.

MASS. REGS CODE tit. 940 §3.02(2).

3.05: General Misrepresentations.  (1) No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.  This prohibition includes, but is not limited to, representations or claims relating to the construction, durability, reliability,...safety, strength, condition,...or the utility of such product or any part thereof,...or the benefit to be derived from the use thereof.

MASS. REGS CODE tit. 940 §3.05(1).

3.16: General.  Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c. 93A §2 if: (1) It is oppressive or otherwise unconscionable in any respect: or (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or (3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or (4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A §2.

MASS. REGS CODE tit. 940 §3.16(1)-(4).

6.03: Basic principles.  (1) The responsibility for truthful and nondeceptive advertising rests with the seller.  Sellers must be able to substantiate material representations made before such representations are disseminated. ...  (2) Sellers shall not use advertisements which are untrue, misleading, deceptive,

[or] fraudulent,....   (3) An advertisement as a whole may be unfair or deceptive although each representation separately construed is literally true. (4) An unfair or deceptive representation may result not only from direct representations and the reasonable inferences they create, but from the seller's omitting or obscuring a material fact.

MASS. REGS CODE tit. 940 §6.03(1)-(4).

6.04: General Requirements.  (1) Misleading Representations.  It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based. (2) Disclosure of Material Representations.  It is an unfair or deceptive act for a seller to fail to clearly and conspicuously disclose in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers.

MASS. REGS CODE tit. 940 §6.04(1)-(2).

6.13: Corrections.   (1) It is an unfair or deceptive act for a seller, [or] manufacturer...who discovers a material error in an advertisement prior to the submission date of the advertisement to fail to promptly correct any material misrepresentation in the advertisement.  (2) It is an unfair or deceptive act for a seller, [or] manufacturer...who discovers a material error in an advertisement subsequent to the submission date of the advertisement to fail to...promptly correct any material misrepresentation by clearly and conspicuously disclosing the information necessary to eliminate such misrepresentation in the same advertisement, or if not feasible, in the same advertising medium, if reasonable, and as close thereto both in proximity and time as reasonably possible.

MASS. REGS CODE tit. 940 §6.13(1)-(2).

## COUNT I

## NEGLIGENT DESIGN

83.    Plaintiffs repeat and reallege each and every allegation set forth above.

84.     Defendant, as manufacturer of the Teflon® product, had at all times relevant a duty to Plaintiffs and members of the Class to design Teflon® with reasonable care, as judged against the standard of an ordinary reasonably prudent designer in similar circumstances, so as to eliminate avoidable dangers.

85.     Defendant, as manufacturer of the Teflon® product, further had at all times relevant a duty to consider the environment in which the Teflon® product would be used, i.e. in the typical home kitchen as a cookware coating, and to consider the reasonably foreseeable risks attendant upon that setting.  Defendant, as manufacturer, was in a superior position to consumers to ensure Teflon®'s safety by recognizing and curing defects.

86.     Defendant breach these duties by failing to exercise reasonable care to eliminate avoidable or foreseeable dangers, as alleged herein, to the users of the Teflon® product in consumer cookware.

87.     Plaintiffs and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating.  Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  As a direct and proximate result of the foregoing, Plaintiffs and the members of the Class have been damaged.

**COUNT II**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
UNDER G.L. c. 106 §2-314**

88.    Plaintiffs repeat and reallege each and every allegation set forth above.

89.    As manufacturer and seller of the Teflon® product, Defendant as a matter of law warrants that its Teflon® product is merchantable and fit for the ordinary purposes for which such goods are used.

90.    As alleged herein, one or more defects or unreasonably dangerous conditions existed at the time the Teflon® product left the Defendant's hands, so that the Teflon® was not reasonably suitable for the ordinary uses, i.e. as a safe cookware coating, for which goods of that kind were sold. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases. These defective and dangerous characteristics distinguish Teflon® from other products intended to be used as cookware coatings.

91.    In addition, Defendant failed to provide Plaintiffs and the Class members with an adequate warning regarding its Teflon® product, i.e. one that would have sufficiently alerted those who may be sensitive to Teflon® and would have allowed Teflon®'s users to balance its risk of harm against its social utility as a cookware coating.

92.    Plaintiffs and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating for use in a manner that the Defendant intended or that could reasonably have been foreseen by the Defendant.

93.    By manufacturing and selling Teflon® containing one or more defects or unreasonably dangerous conditions, and by failing to adequately warn against those defects and conditions, Defendant has breached the implied warranty of merchantability as set forth in G.L. c. 106 §2-314, thereby directly and proximately causing Plaintiffs and the members of the Class to be injured.

94.    Further, by knowingly and intentionally failing to disclose and/or adequately warn against the risks of the Teflon® product that were known to Defendant, Defendant employed fraud and/or deceit in its in violation of the implied warranty of merchantability. As such, Defendant is liable for treble damages under G.L. c. 231 §85J.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF FITNESS
### UNDER G.L. c. 106 §2-315

95.    Plaintiffs repeat and reallege each and every allegation set forth above.

96.    As manufacturer and seller of the Teflon® product, Defendant had reason to know of the particular purpose, i.e. as a safe cookware coating, for which the Plaintiffs and the members of the Class required the Teflon®.  Further, Defendant had reason to know that Plaintiffs and the members of the Class would rely on and did rely on the Defendant's skill and judgment, as product manufacturer, in selecting and furnishing Teflon® suitable for use as a safe cookware coating.  As such, as a matter of law, Defendant warrants that its Teflon® product is fit for this purpose.

97.    As alleged herein, the Teflon® product manufactured and sold by Defendant contained one or more defects and unreasonably dangerous conditions, which rendered the Teflon® unfit for use as a safe cookware coating.  Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  As such, Defendant has breached the implied warranty of fitness as set forth in G.L. c. 106 §2-315, thereby directly and proximately causing Plaintiffs and the members of the Class to be injured.

98.    Further, by knowingly and intentionally failing to disclose and/or adequately warn against the risks of the Teflon® product that were known to Defendant, Defendant employed fraud and/or deceit in its in violation of the implied warranty of fitness.  As such, Defendant is liable for treble damages under G.L. c. 231 §85J.

## COUNT IV

## BREACH OF THE IMPLIED WARRANTIES
## UNDER G.L. c. 106 §2-318

99.    Plaintiffs repeat and reallege each and every allegation set forth above.

100.    As alleged above, Defendant has breached the implied warranty of merchantability under G.L. c. 106 §2-314 and the implied warranty of fitness under G.L. c. 106 §2-315.

101.    Plaintiffs and the members of the Class purchased, in consumer (i.e. non-commercial) transactions, cookware coated with the Teflon® product manufactured and sold by Defendant.  Defendant might reasonably expected Plaintiffs and the members of the Class to use, consume, or be affected by its Teflon® product.

102.    As such, Defendant is liable, pursuant to G.L. c. 106 §2-318, to Plaintiffs and the members of the Class for its breaches of implied warranties, notwithstanding any lack of privity between Defendant on the one hand and Plaintiffs and the members of the Class on the other hand.

103.    Further, by knowingly and intentionally failing to disclose and/or adequately warn against the risks of the Teflon® product that were known to Defendant, Defendant employed fraud and/or deceit in its in violation of the implied warranty of fitness.  As such, Defendant is liable for treble damages under G.L. c. 231 §85J.

## COUNT V

## BREACH OF THE PRE-SALE DUTY TO WARN

104.    Plaintiffs repeat and reallege each and every allegation set forth above.

105.    Under Massachusetts law, DuPont, as manufacturer of the Teflon® product, had at all times relevant a duty to exercise reasonable care to prevent injury to foreseeable users of cookware coated with Teflon®, a product that it knew or should have known is dangerous.  The exercise of reasonable care includes a duty to warn where, as here, a manufacturer such as DuPont had reason to suspect that a warning is necessary.

106.    DuPont breached its duty by failing to exercise reasonable care to prevent injury to Plaintiffs and the members of the Class, foreseeable users of the Teflon® product, which DuPont knew or should have known to be dangerous, in consumer cookware. DuPont further breached its duty by failing to warn Plaintiffs and the members of the Class as to the risks and dangers posed by Teflon®.

107.    Plaintiffs and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating.  Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  As a direct and proximate result of the foregoing, Plaintiffs and the members of the Class have been damaged.

## COUNT VI

## BREACH OF THE POST-SALE DUTY TO WARN

108.    Plaintiffs repeats and realleges each and every allegation set forth above.

109.    Under Massachusetts law, in the case of a product such as Teflon®, which was negligently designed as originally sold, DuPont had a post-sale duty to take reasonable

steps to warn at least purchasers of the product as to its risks as soon as DuPont learned or should have learned of the risk created by its fault.  Further, if DuPont made any post-sale discoveries of improvements which could eliminate or tend to eliminate Teflon®'s risks created by DuPont's initial fault, Dupont also had a post-sale duty to warn at least the purchasers of the product as to such design changes.

110.    Plaintiffs and the members of the Class were purchasers of cookware containing the Teflon® product as a cooking surface coating.  DuPont issued no post-sale warnings to Plaintiffs or the members of the Class.  DuPont therefore breached its post-sale duty to warn.

111.    DuPont is engaged in the business of selling and distributing the Teflon® product.  As such, DuPont is liable for its breach of its post-sale duty to warn because a reasonable person in its position would have provided such a warning, insofar as (i) DuPont knew or reasonably should have known that Teflon® poses a substantial risk of harm, (ii) those to whom a warning might be provided (including Plaintiffs and the members of the Class) could be identified and can reasonably be assumed to be unaware of the risk of harm, (iii) a warning could be effectively communicated and acted upon, and (iv) the risk of harm from Teflon® is sufficiently great to justify the burden of providing the warning.

112.    Plaintiffs and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating.  Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  As a direct and proximate result of the foregoing, Plaintiffs and the members of the Class have been damaged.

**COUNT VII**

## DECEPTIVE AND UNFAIR TRADE PRACTICES

113.    Plaintiffs repeats and realleges each and every allegation set forth above.

114.    This claims is brought pursuant to G.L. c. 93A §§2 and 9.

115.    As required by G.L. c. 93A §9(3), Plaintiffs' counsel mailed a c. 93A demand letter, dated October 26, 2005, to Defendant's counsel more than 30 days before the filing of this First Amended Complaint.  The demand letter identified the Plaintiff, Ronna Casper, reasonably described the unfair and deceptive acts and practices  complained of herein, and reasonably described the injuries suffered.

116.    While Defendant did respond to the demand letter, Defendant failed to make any reasonable offer of settlement.  Defendant's refusal to grant relief upon demand was made in bad faith and with knowledge or reason to know that the acts and practices complained of herein violated G.L. c. 93A §2.

117.    At all times relevant hereto, Plaintiffs and the members of the Class were "persons" within the meaning of G.L. c. 93A §1(a) and are entitled to relief pursuant to the statute in accordance with G.L. c. 93A §9.

118.    At all times relevant hereto, Defendant was engaged in "trade or commerce" as defined by G.L. c. 93A §1(b).

119.    Plaintiffs and the members of the Class entered into consumer transactions to purchase cookware coated with Defendants' Teflon® product.

120.    As alleged herein, during the course of these transactions, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, in the conduct of trade or commerce, in violation of G.L. c. 93A §2.

121.    Defendant's false statements in Massachusetts, contained in its advertising, marketing, and website media, that cookware items coated with its Teflon® product were "safe" and were quality controlled through "rigorous" "testing," and other similar false statements by Defendant, could reasonably be found to have caused consumers to act differently than they would have acted in the absence of such statements.

122.    Likewise, Defendant's failure to disclose and to warn against the risks and dangers of its Teflon® product, as alleged herein, could reasonably be found to have caused consumers to act differently than they would have if presented with complete and truthful disclosures and warnings of Teflon®'s risks and dangers, in which case they may not have entered into their transactions to purchase Teflon® coated cookware.

123.    These false statements and omissions by Defendant violated numerous provisions of the Massachusetts Attorney General regulations, including the following:

a.    MASS. REGS CODE tit. 940 §3.02(2);

b.    MASS. REGS CODE tit. 940 §3.05(1);

c.    MASS. REGS CODE tit. 940 §3.16(1)-(4);

d.    MASS. REGS CODE tit. 940 §6.03(1)-(4); and

e.    MASS. REGS CODE tit. 940 §6.04(1)-(2).

124.    Further, Defendant failed to promptly correct its false statements and omissions after later discovering their errors and material misrepresentations.  Defendant's failure to do so violated another provision of the Massachusetts Attorney General regulations, MASS. REGS CODE tit. 940 §6.13(1)-(2).

125.    Defendant's violations of the implied warranties set forth in G.L. c. 106 §2-314, §2-315, and §2-318, as alleged herein, constitute additional grounds in support of a finding that Defendant has violated G.L. c. 93A.

126.    Defendant's acts, practices, and conduct, as outlined herein, were willful and knowing violations of G.L. c. 93A §2 and invaded the rights of Plaintiffs and the Class to be free from deceptive and unfair business practices.

127.    As a direct and proximate result of Defendant's violations, Plaintiffs and the members of the Class are entitled to judgment under G.L. c. 93A: (i) awarding triple the amount of such actual damages as they may prove or of statutory damages and (ii) requiring Defendant to refund all sums Plaintiffs and the members of the Class paid to purchase cookware coated in Defendant's Teflon® product in Massachusetts during the Class Period or to disgorge all profits which Defendant made on account of such Teflon® coated cookware sales to Plaintiffs and the members of the Class in Massachusetts during the Class Period.

## COUNT VIII

## UNJUST ENRICHMENT

128.    Plaintiffs repeat and reallege each and every allegation set forth above.

129.    As alleged herein, Defendant falsely represented and advertised its Teflon® product to be "safe" when used as a coating on consumer cookware.  Defendant knew or should have known of the potential risks and dangers associated with its Teflon® product when used as a cookware coating.  Defendant failed to disclose to Plaintiffs and the members of the Class, or to adequately warn them about, these risks and dangers.

130.    As a direct and proximate result of Defendant's conduct as alleged herein, Plaintiffs and the members of the Class purchased cookware coated with Defendant's Teflon® product, without understanding Teflon®'s true nature, the dangers it poses to consumers, and the health hazards associated with its use as a cookware coating.  In doing so, they purchased Teflon® coated cookware that they would not have purchased  had Teflon®'s risks and dangers been made known to them, or they paid a higher price for the Teflon® coated cookware than they would otherwise have paid had those risks and dangers been disclosed to the consuming public.

131.    Plaintiffs and the members of the Class purchased their Teflon® coated cookware from the licensees of Defendant, who in turn pay Defendant substantial monies for their Teflon® licensing rights.   Thus, as a result of their purchases of cookware coated with Defendant's Teflon® product, Plaintiffs and the members of the Class have conferred a substantial monetary benefit upon Defendant, which Defendant knew of and appreciated, accepted, and retained.

132.    By way of Defendant's conduct, as alleged herein, Defendant has been unjustly enriched, in an amount yet to be determined, at the detriment of Plaintiffs and the Class, to the extent Defendant received and kept revenues, relating to the sale of cookware coated with its Teflon® product, which Defendant would not have received absent its improper conduct.  As such, Defendant's acceptance and retention of the  monetary benefit alleged herein has occurred under circumstances which make it inequitable if a restitution payment is not made to Plaintiffs and the Class and if Defendant is not ordered to disgorge its ill-gotten profits derived from sales of Teflon® coated cookware.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, pray for judgment as follows:

1.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Declaring this action to be a class action properly maintained pursuant to G.L. c. 93A §9(2);

3.    Finding Defendant liable as alleged in this Complaint;

4.    With respect to Counts I - VI, awarding Plaintiffs and the Class actual damages, including where appropriate consequential damages, together with pre-judgment and post-judgment interest thereon;

5.    With respect to Counts II - IV, awarding Plaintiffs and the Class treble damages pursuant to G.L. c. 231 §85J;

6.    With respect to Count VII, awarding Plaintiffs and the Class actual damages or statutory damages, whichever is greater;

7.    Trebling pursuant to G.L. c. 93A of any actual damages, plus all interest, awarded under Count VII;

8.    With respect to Count VIII, entering an award of restitution to Plaintiffs and the Class;

9.    Ordering disgorgement by Defendant of all ill-gotten profits related to the conduct alleged herein;

10.    Ordering creation of a fund for ongoing medical monitoring of consumers who have purchased cookware coated with Defendant's Teflon® product;

11.    Ordering creation of a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cookware coated with Defendant's Teflon® product;

12.    Entering an injunction barring Defendant from continuing in the licensing, design, manufacture, marketing, advertising, sale, and/or distribution of its Teflon® product for purposes of being used as a cookware coating, or alternatively, an injunction requiring that Defendant and its licensees ensure that an adequate warning, fully disclosing all of Teflon®'s risks and hazards, accompany any Teflon® coated cookware products to be sold in the future;

13.    Ordering Defendant to replace and/or exchange all existing Teflon® coated cookware in the possession of Plaintiffs and the members of the Class with comparable products containing non-hazardous "non-stick" coatings or properties, or alternatively, with the monetary equivalent thereof;

14.    Awarding Plaintiffs and the members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees; and

15.    Awarding Plaintiffs and the members of the Class such other and further relief as may be just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request trial by jury of all issues so triable as a matter of law.


Dated: December 28, 2005                    By their attorneys,


                                            **/s/Thomas G. Shapiro**

                                            Thomas G. Shapiro (BBO #454680)
                                            Matthew L. Tuccillo (BBO #643336)
                                            Shapiro Haber & Urmy LLP
                                            53 State Street
                                            Boston, MA 02109
                                            Tel:    (617) 439-3939

Of Counsel:
Kluger, Peretz, Kaplan & Berlin, P.L.
201 So. Biscayne Blvd., Suite 1700
Miami, FL 33131
Tel:    (305) 379-9000